{¶ 18} I concur in the majority's disposition of relator's objection to the magistrate's decision. However, because I would also overrule Anderson's objections to the magistrate's decision, I respectfully dissent from the portion of the majority opinion that determines otherwise. I dissent from the judgment because I would grant the writ of mandamus as recommended by the magistrate.
 {¶ 19} In my view, the magistrate correctly concluded that State exrel. Ford Motor Co. v. Indus. Comm., 98 Ohio St.3d 20, 2002-Ohio-7038,780 N.E.2d 1016, is inapposite to the facts of this case. Anderson's activities of opening her store in the morning, using the cash register, assisting customers with selecting gifts and other purchases, and providing customers with information regarding upcoming classes offered at the store, are markedly different in quality from the activities of the claimant in Ford.
 {¶ 20} Like Anderson, the claimant in Ford was surveilled, but unlike in the present case, it was specifically noted that the claimant in Ford
was never observed at a job site and was never observed doing any lawn or landscaping work himself. In Ford, the claimant's activities were limited to supplying his employees with the equipment they needed to do their work (which he needed to do only because he stored the equipment at his residence as opposed to a store or an office as would be the case in other types of businesses), and paying his employees for the work they performed. Any employer who fails to do those two tasks will shortly be left with no enterprise at all.
 {¶ 21} Anderson's activities, however, were not the kind of things that only "the boss" can do, as in Ford, but were things she could have, and presumably did, pay others to do. Thus, notwithstanding the fact that she has never paid herself, she was engaged in work that precludes the receipt of temporary total disability compensation ("TTD").
 {¶ 22} In my view, the facts of the instant case are more akin to those in State ex rel. Cassano v. Indus. Comm., 10th Dist. No. 03AP-1227, 2005-Ohio-68. In that case, the claimant operated his own car repair business while he was employed as a driver, and continued to operate his business while he was receiving TTD following his industrial injury. Like Anderson, the claimant in Cassano argued that he merely maintained his business in the manner found consistent with the receipt of TTD in Ford.
 {¶ 23} We rejected that argument based upon evidence that the claimant had opened and closed the business, talked with customers and assisted his friends (who he had engaged to help him, though he did not pay them as employees) with mechanical work. We concluded that the claimant's actions were not merely limited steps designed to preserve his investment, or to maintain his business as a going concern until his injuries healed. Rather, these activities constituted active involvement in business operations.
 {¶ 24} Citing this court's decision in State ex rel. Campbell v.Indus. Comm., 10th Dist. No. 02AP-1253, 2003-Ohio-4824, we noted that "`[i]nvolvement such as making sales or assisting in day-to-day operations of a shop may be viewed as employment incompatible with disability, as opposed to mere ownership or managing one's personal finances.'" Cassano, supra, at ¶ 35, citing Campbell, at ¶ 55
 {¶ 25} Though the character of Anderson's activities is the paramount consideration, I believe it is also noteworthy that Anderson is not merely maintaining a business she had firmly established prior to her industrial injury, as was the case in Ford. In Ford, "the allowed conditions prevent[ed] an injured worker from continuing his former participation in a business he operated prior to his injury, and * * * forced the claimant to withdraw from his former business activities except those necessary to preserve the business until he is physically able to return to it [.] * * * Campbell, supra, at ¶ 56.
 {¶ 26} In the case of State ex rel. Sagenich, 10th Dist. No. 03AP-742, 2004-Ohio-2841, this court again pointed out that Ford is applicable only in the narrow context of an injured worker who had apreexisting business to which he formerly made a physical contribution, and whose industrial injury has forced him to replace that contribution with other laborers while he retains minimal supervisory control in order to maintain the business as a going concern.
 {¶ 27} Given this court's previous interpretation of Ford, which I believe is correct, I respectfully disagree that Ford is applicable in the present case. This is true notwithstanding the fact that there was no evidence before the commission that Anderson has received any wages in exchange for her activities at her shop. There was also no evidence that the claimant in Cassano had received any wages. Nonetheless, we concluded that he was engaged in work activities. See Cassano, supra, at ¶ 37. As we have held on previous occasions, "where the claimant operates the business in which he is employed, he has substantial control over its records. Thus, the absence of income in the form of wages or salary need not be a persuasive factor." State ex rel. Gyarmati v. George E. FernCo., 10th Dist. No. 01AP-1357, 2002-Ohio-4323, at ¶ 72. See, also, Stateex rel. Greathouse v. Indus. Comm. (Dec. 7, 1993), 10th Dist. No. 92AP-1390.
 {¶ 28} For all of the foregoing reasons, I would overrule Anderson's objections, and would grant a writ of mandamus consistent with the recommendation of the magistrate.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State ex rel. Honda of America :
Manufacturing, Inc., :
 Relator, :
v. : No. 04AP-765
The Industrial Commission of Ohio : (REGULAR CALENDAR)
and Edith K. Anderson, :
 Respondents. :
 MAGISTRATE'S DECISION Rendered on March 30, 2005 Vorys, Sater, Seymour and Pease LLP, Robert A. Minor and Sebastian E.Proels, for relator.
Jim Petro, Attorney General, and Dennis L. Hufstader, for respondent Industrial Commission of Ohio.
Larrimer Larrimer, and Thomas L. Reitz, for respondent Edith K. Anderson.
In Mandamus
 {¶ 29} In this original action, relator, Honda of America Manufacturing, Inc. ("Honda"), requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying its motion to declare as an overpayment all temporary total disability ("TTD") compensation paid to respondent Edith K. Anderson starting December 30, 2002, and that respondent be found to have fraudulently obtained the compensation, and to enter an order declaring the overpayment and finding that respondent fraudulently obtained the compensation.
Findings of Fact:
 {¶ 30} 1. On January 24, 1991, Edith K. Anderson ("Anderson") sustained an industrial injury while employed as an assembly worker for Honda, a self-insured employer under Ohio's workers' compensation laws. On that date, Anderson tripped and fell, striking her head and twisting her back. Her industrial claim is allowed for "concussion; cervical sprain; sacroiliac sprain; reflex sympathetic dystrophy; sprain of neck," and was assigned claim number L65217-22. "Reflex sympathetic dystrophy" was added to the claim in July 1998.
 {¶ 31} 2. On December 14, 2000, Anderson had a spinal cord stimulator placed in her upper back.
 {¶ 32} 3. On June 25, 2001, William W. Nucklos, M.D., wrote:
* * * [A]fter observing your improvement with the insertion of the spinal cord stimulator by Dr. Rothstein for the neck and upper extremities, it is my medical opinion that had I known of the possibility of your attaining such treatment, then it would have certainly been considered in the equation as it relates to an opinion regarding maximum medical improvement. There-fore, in consideration of the improvement you have received relative to the neck and upper extremities, I am optimistic that you will achieve additional benefit once the spinal cord stimulator is inserted for the low back/lower extremities. In fact, it is my medical opinion that should the spinal cord stimulator prove to be as beneficial to the lower extremities as it has for the upper extremities, you would certainly be a candidate for vocational retraining and gainful employment.
* * * [I]t is my medical opinion that you are now temporarily and totally disabled while awaiting implantation of the spinal cord stimulator for the low back and lower extremities following which you should be re-evaluated.
 {¶ 33} 4. On July 11, 2001, Anderson moved for TTD compensation.
 {¶ 34} 5. Following an October 19, 2001 hearing, a district hearing officer ("DHO") issued an order awarding TTD compensation beginning December 14, 2000, the date the upper spinal cord stimulator was implanted. The award was based in part upon Dr. Nucklos's report. The award was administratively affirmed by a staff hearing officer ("SHO") following a December 10, 2001 hearing.
 {¶ 35} 6. On February 21, 2002, Honda approved Anderson's request for a second spinal cord stimulator.
 {¶ 36} 7. In August 2002, Anderson's husband died. Anderson decided to invest the insurance money in a business venture. Only Anderson invested money in this venture.
 {¶ 37} 8. On December 6, 2002, Anderson registered with the Ohio Secretary of State the business name "My Crop Shop LTD" ("My Crop Shop").
 {¶ 38} 9. On December 30, 2002, Anderson obtained a vendor's license for My Crop Shop. In January 2003, Anderson leased a store in the Marysville, Ohio area.
 {¶ 39} 10. On or about February 13, 2003, Anderson opened her business venture using the name My Crop Shop.
 {¶ 40} 11. Anderson describes her business as "scrapbooking, archival, art data, pictures, transfer of old 8-millimeter movies over to DVD, that — archiving of all kinds of media." (Tr. 11.)
 {¶ 41} 12. My Crop Shop also offers classes in "scrapbooking." According to Anderson's daughter, Ms. Elliott, who is employed at the store, customers are taught how to "crop out" unimportant things in a photograph so that it fits better on a page. (Tr. 15). Products are sold at the store to the scrapbooking customers that will embellish and preserve their photographs. Also, photographs can be put to DVD with music. (Tr. 15).
 {¶ 42} 13. Anderson hired a store manager, Mr. DeWitt, who has himself owned several businesses. Anderson also employs her two daughters at the store, Ms. Elliott and Ms. Slone. Anderson also hires teachers to teach the scrapbooking classes. She employs about ten people.
 {¶ 43} 14. Upon being informed that Anderson was operating a business venture while receiving TTD compensation, Honda hired a private investigative firm ("PI") to conduct surveillance on Anderson's activities. Honda received several PI reports regarding the surveillance.
 {¶ 44} 15. The PI reports indicate that surveillance was conducted on five days, i.e., Thursday, April 24, Friday, April 25, Tuesday, May 6, Thursday, May 8, and Monday, June 30, 2003. On each occasion, surveillance was begun in the morning at Anderson's residence. On each occasion, Anderson was observed driving her vehicle from her residence to the store, which she entered.
 {¶ 45} 16. On July 3, 2003, at Honda's request, Anderson was examined by Oscar F. Sterle, M.D. Dr. Sterle reported:
Based on the above history, the findings on my examination and review of the medical file, in my medical opinion, the claimant has reached a treatment plateau and is at Maximum Medical Improvement for the allowed conditions in the claim.
* * *
In my medical opinion, the claimant cannot return to her former position of employment but the claimant is capable of sustaining remunerative employment.
* * *
The claimant will require light duty restrictions.
* * *
The claimant stated that her symptoms have considerably improved with the continuous use of two spinal cord stimulators. This treatment is necessary for the allowed condition of this claim.
(Emphasis sic.)
 {¶ 46} 17. Thereafter, Honda requested that Dr. Sterle review the surveillance videos and issue a report. In a report dated August 14, 2003, Dr. Sterle stated:
It appears that for my examination, the claimant did misrepresent her physical capabilities, stating that she could not work in her own scrap booking store, that she had weakness on her left side and stated that air-conditioning" hurts my bones". The store appears to be air conditioned, with no open windows or doors for ventilation.
She had stated that she could not lift over 10 pounds, not even able to hold a baby. She informed me during the interview that she was able only to do very little driving and limited walking in her neighborhood.
Upon viewing the videotapes, the claimant appears to be able to perform tasks and other activities outside those listed on her work restrictions given by her treating physicians.
* * *
In my medical opinion, the claimant's physical activities especially those on the videotape are inconsistent with Dr. Nucklos' opinion of her current physical capabilities.
 {¶ 47} 18. On August 22, 2003, Honda moved to terminate TTD compensation based upon Dr. Sterle's report. Honda also moved for a declaration of an overpayment of TTD compensation beginning December 30, 2002, and for a finding that Anderson fraudulently obtained the compensation. In support, Honda submitted the PI reports, video surveillance tapes, Dr. Sterle's reports, C-84s from Dr. Nucklos, and canceled TTD compensation checks.
 {¶ 48} 19. Following an October 2, 2003 hearing, which was recorded and transcribed for the record, a DHO issued an order stating:
It is the order of the District Hearing Officer that the C-86 Motion, filed by self-insured employer on 08/22/2003, is granted to the extent of this order.
The District Hearing Officer orders that temporary total disability compensation be terminated as of today's date of hearing (10/02/2003) based upon a finding that the allowed conditions have reached maximum medical improvement. As such, temporary total disability compensation for periods subsequence [sic] to today's date of hearing is not properly payable absence evidence, consistent of the [State ex rel. Bing v. Indus.Comm. (1991), 61 Ohio St.3d 424] case, demonstrating that the allowed conditions have again become "temporary" in nature. The finding of maximum medical improvement is based upon Dr. Sterle's 07/03/2003 narrative report. All evidence, including but not limited to Dr. Nucklos' 09/30/2003 narrative report, which has been submitted by the claimant has been reviewed and evaluated by the District Hearing Officer in rendering this decision.
Temporary total disability compensation received by the claimant from 02/13/2003 through today's date of hearing (10/02/2003) is deemed not
properly payable. The District Hearing Officer further orders that such compensation be deemed overpaid.
The District Hearing Officer specifically finds that the claimant returned to work on 02/13/2003. On 02/13/2003, the claimant's business ("My Crop Shop") opened its doors for the first time for business. This business venture was planned by the claimant back in August of 2002 when she received a certain sum of money as a result of her husband's death. On 12/06/2002, the claimant registered the name of her business with the Secretary of State's office and she then obtained her vendor's license on 12/30/2002. Business cards issued by the claimant indicate only her name ("Karen Anderson") as the sole owner of the business at 15779 US Highway 36 in Marysville, Ohio.
At hearing, the claimant testified repeatedly that, while being the owner of "My Crop Shop," she did not operate the business. She testified that she was present on the business property between two and three times per month. This testimony is contradicted by the surveillance report of 05/13/2003 and the testimony of Mike Giesler.
In the course of his investigation of the claimant, Mr. Giesler testified that he performed surveillance on six [sic] separate occasions: 04/24/2003, 04/25/2003, 05/06/2003, 05/08/2003, and 06/30/2003. The surveillance began with Mr. Giesler waiting for the claimant to leave from her residence and ended, each time, with Mr. Giesler observing the claimant drive to her store. On 04/25/2003, Mr. Giesler observed the claimant arrive at the rear of her store, unlock the rear door of the building, and turn on the "open" sign in the front of the store. When Mr. Giesler subsequently entered the store, he observed the claimant using the cash register. On 05/06/2003, Mr. Giesler entered the store and the claimant assisted him in finding an appropriate Mother's Day gift. Mr. Giesler also observed the claimant talking to another customer about classes that take place within the store. The claimant again assisted Mr. Giesler, on 05/08/2003, by showing him several sample scrap books. Claimant appeared familiar with the store's inventory and the prices charged for the various items. She described herself to Mr. Giesler as being talented in art and indicated that scrap-booking classes are held at the store on weekday evenings.
The District Hearing Officer specifically asked Mr. Giesler whether he conducted surveillance on any days other than those described by his testimony. Mr. Giesler specifically testified that every day that he conducted surveillance he observed the claimant at her business. The District Hearing Officer finds Mr. Giesler's testimony to be credible. Claimant's testimony that she only appeared at her business two to three times a month is not credible and the claimant has failed to explain why she would be conducting the activity described by Mr. Giesler and demonstrated by video tape evidence if she was not, in fact, working.
While there does not appear to be persuasive evidence that the claimant was paid money as compensation for her services, the District Hearing Officer finds that the claimant was the owner/operator of her business and any efforts made by the claimant on behalf of the business was for the benefit of the business and increased the profits of the business and thereby benefited the claimant. Therefore, despite the assertion of Gina M. Pennell (C.P.A. hired by the claimant), the above-cited evidence demonstrates that the claimant was not entitled to receive temporary total disability compensation. Eligibility for such compensation ends, according to State ex rel. Ramirez v. Industrial Commission (1982),69 Ohio St.2d 630, when the claimant "returns to work." The Supreme Court of Ohio later confirmed that the word "work," as used in Ramirez, refers to any "substantial gainful employment" and not merely the former position of employment. State ex rel. Nye v. Industrial Commission
(1986), 22 Ohio St.3d 75, 78. In State ex rel. Blabac v. IndustrialCommission (1999) Ohio St.3d 113, the Court rejected the claimant's argument that the receipt of nominal earnings does not render him ineligible for temporary total disability compensation; the receipt of wages need not be present, therefore, for full-ten work in order to bar temporary total disability compensation.
It is further the order of the District Hearing Officer that the claimant committed fraud.
The District Hearing Officer finds that the self-insured employer established the following mandatory prima facie elements of fraud: (1) a representation, or when there is a duty to disclose, concealment of fact; (2) which is material to the transaction at hand; (3) made falsely, with the knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; (6) a resulting injury proximately caused by the reliance. (See Memo Number U3 of the Policy Statements and Guidelines, Overpayment Policy)
The District Hearing Officer finds that the claimant had a duty to disclose to the self-insured employer that, not only was she owner of "My Crop Shop," but also the fact that she was actively working at her business. As demonstrated by the above-cited evidence, the claimant was in fact working during periods in which she indicated on C-84 Request Forms that she was not working "in any capacity." Also, the District Hearing Officer finds that the claimant concealed this fact from her physician of record. The District Hearing Officer finds that the C-84 Request Forms are material because, without those forms, the self-insured employer would not pay temporary total disability compensation. As demonstrated by the above-cited evidence, the claimant's representation to the self-insured employer that she was not working was clearly false.
Additionally, in finding that Memo Number U3 of the Policy Statements and Guidelines, Overpayment Policy was met, the District Hearing Officer finds that the claimant knew that she would not receive continued payment of temporary total disability compensation if she truthly [sic] informed the self-insured employer that she was working. The claimant, therefore, intentionally withheld this material information and intentionally stated that she was not working "in any capacity" in order to continue in her improper pursuit of temporary total disability compensation. The self-insured employer relied upon the claimant's misrepresentations on the C-84 Request Forms prior to issuing workers' compensation checks to the claimant. Had the claimant truthly [sic] responded to the questions in the C-84 Request Forms, the self-insured employer would have withheld payment of temporary total disability compensation. Due to the improper payments made to the claimant, there is a resulting injury proximately caused by the reliance by the self-insured employer.
(Emphasis sic.)
 {¶ 49} 20. Anderson administratively appealed the DHO's order of October 2, 2003.
 {¶ 50} 21. Following a January 13, 2004 hearing, which was not recorded, an SHO issued an order stating:
The order of the District Hearing Officer, from the hearing dated 10/02/2003, is vacated.
It is the finding of the Staff Hearing Officer that temporary total disability compensation was appropriately paid through 10/01/2003, therefore, no overpayment is found. Based on the 07/03/2003 report of Dr. Sterle, it is found that the allowed conditions have reached maximum medical improvement. On this basis temporary total disability compensation is terminated as of 10/02/2003, the date of the District Hearing Officer hearing.
It is the finding of the Staff Hearing Officer that the evidence on file does not demonstrate: (1) that the claimant's activities as the owner of My Crop Shop generated income other than secondarily, (2) that the claimant was paid any wages, (3) that the claimant's physical activities demonstrated an ability to return to work at her former job or other work at the same physical level as her former job, or (4) that any fraud occurred.
In order to terminate temporary total disability compensation, the claimant must have reached maximum medical improvement, be capable of returning to the physical level of work she was doing at the time of the injury, or she must be found to be participating in activities that produce money in more than a secondary manner. Such activities can be either full or part-time. Ford Motor Company v. Industrial Commission
(2002), 97 O.S.3d.
There is currently no medical evidence on file that states the claimant is capable of returning to the physical requirements of her former job, nor is there medical evidence stating the activities she engaged in at My Crop Shop demonstrate an ability to return to her former job. While Dr. Sterle (08/14/2003) gives an opinion that the claimant's activities exceeded the physical restrictions she was given by Dr. Nucklos (which Dr. Nucklos disagrees with on 09/30/2003), nowhere does Dr. Sterle state the claimant's activities demonstrate an ability to return to her former job.
There has been no evidence submitted to show that the claimant has received any wages or income from her ownership of the My Crop Shop. The employer has submitted no evidence (such as paychecks, business records, tax records, etc.) to show that the claimant has received any income from her store. The only evidence on this issue is the 10/01/2003 letter from Gina Pennell, CPA, the claimant's accountant. Ms. Pennell states that the claimant has not been paid to do any work for My Crop Shop. While the claimant has a financial investment in the business, Ms. Pennell states there is currently no intention for the claimant to receive a paycheck or a loan payment from My Crop Shop. Further, the claimant in this case argues that her activities did not constitute work. Since the claimant did not receive any income or wages and argues that her activities did not constitute work, it is found that Blabac v. Industrial Commission
(1999), 87 O.S.3d 113, and its progeny, do not apply.
The Staff Hearing Officer finds the Ohio Suprement [sic] Courts holding in Ford Motor Company applicable in this case. In Ford, the court indicates that the claimant's activities must generate income for her business in a primary and not just in a secondary way. The Staff Hearing Officer finds the evidence submitted insufficient to show that the claimant's activities have produced income of more than a secondary nature.
The employer's counsel indicated that they had the claimant investigated over a three-month period. Over this entire three-month period they have only five days of video surveillance. Only on three of these five occasions (04/25/2003, 05/06/2003, and 05/08/2003) was the claimant observed giving any customer assistance. On 04/24/2003 the claimant was merely observed to be in the shop for about three-and-a-half hours. On 06/30/2003 the claimant was noted to be present for three hours. On the three occasions the claimant did give customer assistance, the assistance was minimal, consisting of answering questions and leading the customer to displays. On one occasion the claimant operated the cash register. Considering the fact that the investigation was done over a three-month period, the Staff Hearing Officer finds the investigation evidence documents only minimal activity.
The claimant testified to the District Hearing Officer that she only went in to the store from time to time, about three times per month. (Transcript pg. 13) This is consistent with the number of times the claimant is shown to be at the store per month by the investigation report. Further, the claimant testified to the District Hearing Officer that the store was run by her children and managed by a Mr. Dewitt. (Transcript pg. 17) This is consistent with the 09/03/2003 letter from case manager Ms. Colbert. Ms. Colbert notes the claimant's statement to her on 03/11/2003 that the business was run by her daughters. This evidence also indicates that the claimant was not actively engaged in the operations of the business.
Passive investments are permitted when a person is temporarily and totally disabled from their regular job unless the person's activities in support of that investment are more than minimal and produce money in more than a secondary manner. The Staff Hearing Officer finds this case to be consistent with the Ford Motor Company case. The activities of the claimant that are demonstrated by the employer's evidence are minimal, with only five occasions of the claimant being in the store and only three doing any customer service. Further, any income generated from these activities would appear to be secondary in that they further the good will of the business. If there were any direct income, arguably the amount of the customer sale, such would appear to be minimal. While the facts in this case may not be quite as clear cut as those in Ford MotorCompany, the Staff Hearing Officer finds the claimant's documented activities to still be sufficiently minimal in number and nature to be only secondarily responsible for any income generated by the claimant's business, and thus within the holding of Ford.
Finally, whether or not the claimant's activities are considered activities sufficient to bar receipt of temporary total disability compensation, the Staff Hearing Officer finds no fraud in this case. The evidence does not support that there has been misrepresentation or a concealment of fact, or a statement made with knowledge that it was false or with such recklessness that knowledge might be inferred.
The claimant testified that shortly after she opened her business she told her case manager that she had done so. This is supported by the 09/03/2003 letter from Ms. Colbert. Ms. Colbert states that on 03/11/2003 she was informed by the claimant that the claimant had opened a store run by her daughters, and wanted to know if any tasks she does, like book keeping, could be considered as work hardening. The employer's representatives stated that the case manager was hired by them and is their agent. Based on this evidence it is found the claimant did notify the employer about the business, through their agent, as far back as 03/11/2003. This clearly shows that there has been no concealment or misrepresentation, as the claimant told the employer's representative about the store and the fact she would be doing some minimal activities such as bookkeeping.
Further, the claimant testified that she did not believe that what she did in regards to the owning and operating of her business was considered work or employment. This is supported by the fact she notified her case manager of the business and the possibility she may be doing minimal activities in support of it. If the claimant considered such to be working or employment, it is doubtful she would have notified the employer's agent that she was going to do it. This indicates the claimant did not have any intent to commit fraud, and that she did not make any representation that was false. The fact the claimant indicated on the C-84 forms that she was not working is consistent with the fact that she did not consider the activities in support of her business to be employment. The Hearing Officer does not find it inconsistent for a person who has worked an hourly job all their life to believe that owning a business run by others would not be considered working. Nor is such inconsistent with the holding in Ford Motor Company. Further, in light of the holding in Ford, the Staff Hearing Officer does not find the claimant's belief to be so reckless that knowledge of its falsity can be inferred.
 {¶ 51} 22. On February 25, 2004, another SHO mailed an order refusing Honda's administrative appeal from the SHO's order of January 13, 2004.
 {¶ 52} 23. On July 28, 2004, relator, Honda of America Manufacturing, Inc., filed this mandamus action.
Conclusions of Law:
 {¶ 53} Two issues are presented: (1) whether the commission abused its discretion by finding that Anderson was not working during the period of her receipt of TTD compensation; and (2) whether the commission abused its discretion in finding that the compensation was not fraudulently obtained.
 {¶ 54} Turning to the first issue, the Supreme Court of Ohio in Stateex rel. Ford Motor Co. v. Indus. Comm., 98 Ohio St.3d 20, 2002-Ohio-7038, ¶ 18-19, had occasion to summarize the law pertinent to this action. TheFord court states:
TTC is prohibited to one who has returned to work. R.C. 4123.56(A);State ex rel. Ramirez v. Indus. Comm. (1982), 69 Ohio St.2d 630, 23 O.O.3d 518, 433 N.E.2d 586. * * *
Work is not defined for workers' compensation purposes. We have held, however, that any remunerative activity outside the former position of employment precludes TTC. State ex rel. Nye v. Indus. Comm. (1986),22 Ohio St.3d 75, 78, 22 OBR 91, 488 N.E.2d 867. We have also held that activities medically inconsistent with the alleged inability to return to the former position of employment bar TTC, regardless of whether the claimant is paid. State ex rel. Parma Community Gen. Hosp. v. Jankowski,95 Ohio St.3d 340, 2002-Ohio-2336, 767 N.E.2d 1143, ¶ 15. Activities that are not medically inconsistent, however, bar TTC only when a claimant is remunerated for them. Id. at ¶ 14-15, 767 N.E.2d 1143. Work, moreover, does not have to be full-time or even regular part-time to foreclose TTC; even sporadic employment can bar benefits. State exrel. Blabac v. Indus. Comm. (1999), 87 Ohio St.3d 113, 717 N.E.2d 336.
 {¶ 55} However, the remuneration issue bears heightened scrutiny when a claimant's alleged work activities involve a business operated or controlled by the claimant. In that scenario, the absence of a wage or salary paid to the claimant is not necessarily determinative of the remuneration issue. Moreover, the absence of a profit from the business venture is not necessarily determinative. The issue is whether the claimant was involved in business activities for a financial or remunerative gain, not whether the claimant actually realized any gain or whether the gain was substantial. See [State ex rel.] Greathouse v.Indus. Comm. (Dec. 7, 1993), Franklin App. No. 92AP-1390; State ex rel.Gyarmati v. Indus. Comm., Franklin App. No. 01AP-1357, 2002-Ohio-4323.
 {¶ 56} Because the commission relied heavily on Ford, that case bears additional discussion here.
 {¶ 57} In 1998, Christopher D. Posey held two jobs concurrently: one with Ford Motor Company and the other was his own lawn care business — Nature's Creations Landscaping. From 1994 through 1996, Posey was the sole employee of his business. In 1997, he hired another employee.
 {¶ 58} In 1998, Posey injured his neck while working at Ford. Posey's injury forced him to stop his physical participation in his own lawn care business so he hired three more employees. The injury also temporarily forced Posey from his job at Ford and he received TTD compensation from June 1998 through September 8, 1998.
 {¶ 59} Ford later sought to recoup TTD compensation alleging that Posey's participation in his business constituted work and, therefore, prohibited TTD compensation. Evidence presented regarding Posey's participation in his business, however, established only that Posey signed his four workers' paychecks and fueled and drove riding lawnmowers onto a truck. Surveillance of Posey by Ford supported Posey's contention that he did no landscaping work in connection with his business while receiving TTD compensation.
 {¶ 60} The commission refused Ford's request to declare an overpayment, explaining in part:
"The claimant states that he engaged in the following business activities: approximately once a week he put gas in lawn mowers, signed checks and issued cash for the employees['] wages; on one occassion [sic] he pushed his self propelled mower into the garage and he continued to store the landscaping equipment at his residence just as he had done before he became disabled.
"Prior to becoming temporarily and totally disabled, the claimant performed nearly all of the general labor for his business. He cut grass and maintained lawns for approximately thirty-five to forty customers. Occasionally he cut trees and installed retaining walls.
"With the exception of signing payroll checks, all of the clerical duties were performed by his girlfriend.
* * *
"Surely the claimant would have been seen working if he had carried on his business pursuits, after his injury as he had done before, because the nature of his business required that the work be done outside.
"Instead the evidence supports the claimant's contention that he withdrew from nearly all business activities except those necessary to preserve the business until he was physically able to return to it. The Staff Hearing Officer does not believe the Nye and [State ex rel. Durantv. Superior's Brand Meats, Inc. (1994), 69 Ohio St.3d 284] [decisions] prevent the meager activities engaged in by the claimant nor do they require a self-employed individual to relinquish even that control which is absolutely necessary to preserve the existence of his pre-existing enterprise.
Id. at ¶ 6-8, 13-14.
 {¶ 61} The commission's decision prompted Ford to file a mandamus action. The Ford court upheld the commission's decision. The Ford court explained:
Ford asserts that Blabac is controlling and bars TTC here. In Blabac,
the claimant, John Blabac, was getting TTC when it was discovered that he was earning wages as a scuba diving instructor. While his partner did the physical instruction, Blabac sat at poolside with a clipboard, grading the students. Id. at 113, 717 N.E.2d 336. Whether he lectured, prepared or graded written exams, or otherwise instructed students was not known.
The commission terminated TTC and declared an overpayment. Blabac argued that only "substantially gainful" work could bar TTC, and that his work was neither substantial nor gainful. We disagreed with Blabac, holding that low paying and sporadic employment was still work. Because Blabac was paid for his efforts, we determined that they constituted work, and barred TTC. We suggested that wage-loss compensation would have been more appropriate for Blabac's circumstances.
Ford argues that under Blabac, any work precludes TTC and asserts thatBlabac forbids TTC here. Ford, however, overlooks the distinction between this case and Blabac. Blabac never disputed that his actions constituted work. He argued instead that he had not worked enough to prevent TTC. Claimant herein, on the other hand, argues that his activities were not work, rendering Blabac off point.
Claimant' assertion has merit. Unlike the claimants in Blabac, Nye,State ex rel. Johnson v. Rawac Plating Co. (1991), 61 Ohio St.3d 599,575 N.E.2d 837, and State ex rel. Durant v. Superior's Brand Meats, Inc.
(1994), 69 Ohio St.3d 284, 631 N.E.2d 627, this claimant's activities did not, in and of themselves, generate income; claimant's activities produced money only secondarily, e.g., claimant signed the paychecks that kept his employees doing the tasks that generated income.
Obviously, application of this rationale must be applied on a case-by-case basis and only when a claimant's activities are minimal. A claimant should not be able to erect a façade of third-party labor to hide the fact that he or she is working. In this case, however, claimant's activities were truly minimal and only indirectly related to generating income. * * *
(Emphasis sic.) Id. at ¶ 20-24.
 {¶ 62} Here, the commission abused its discretion in determining that Anderson was not working during the period of her receipt of TTD compensation. The commission abused its discretion in at least three respects: (1) the commission misapplied the Ford case by finding that Anderson's activities produced money only "secondarily" as was the case in Ford; (2) the commission found it determinative that Anderson had received no wages or income from her business during the period at issue; and (3) the commission found that Anderson's testimony that she only went to the store about three times per month is consistent with the number of occasions she was reported to be at the store by the surveillance evidence.
 {¶ 63} Analysis begins with the observation that the SHO's order indicates that the SHO relied upon the surveillance reports and found them credible even though the order does not directly state that the reports were found to be credible as was the case with the DHO's order. The SHO found that on three occasions, April 25, May 6, and May 8, 2003, Anderson was observed giving "customer assistance" in her store. On one of those occasions, Anderson operated the cash register. The SHO incorrectly held that Anderson's "customer assistance" activities on those three identified occasions produces money only "secondarily" underFord.
 {¶ 64} Clearly, "customer assistance" is in fact the work activity that directly generates sales that produce revenue for the business. Acting as a salesperson for the store is indeed work that directly generates money for the business.
 {¶ 65} In Ford, Posey did not engage in landscaping or lawn mowing activities, the activities that directly produced the revenue of the business. Posey engaged only in activities, such as writing checks to employees, that secondarily produced income.
 {¶ 66} Thus, the commission misapplied the Ford case by holding that Anderson's customer assistance activities produce money only secondarily for her business.
 {¶ 67} The commission further erred by finding it determinative that Anderson had received no wages or income from the business. In this regard, the SHO's order states:
There has been no evidence submitted to show that the claimant has received any wages or income from her ownership of the My Crop Shop. The employer has submitted no evidence (such as paychecks, business records, tax records, etc.) to show that the claimant has received any income from her store. The only evidence on this issue is the 10/01/2003 letter from Gina Pennell, CPA, the claimant's accountant. Ms. Pennell states that the claimant has not been paid to do any work for My Crop Shop. While the claimant has a financial investment in the business, Ms. Pennell states there is currently no intention for the claimant to receive a paycheck or a loan payment from My Crop Shop. * * *
Ms. Pennell's October 1, 2003 letter, referenced by the SHO, states:
As of October 1, 2003, Mrs. Edith Keren Anderson has not received any payroll checks from My Crop Shop, since its start up. I am her accountant and I have seen her books and statements and can state that she has not been paid to do any work for this establishment.
Prior to Mrs. Anderson receiving paychecks, her share-holder's loan to My Crop Shop will be repaid. At this time, Mrs. Anderson and I are still pulling together the documentation to summarize her loan to the shop. Her investment in My Crop Shop includes, but is not limited to, cash transfers from her other personal accounts, personal checks written for supplies, inventory purchases and fixed assets and credit card purchases.
At this date, there is no intention for Mrs. Anderson to receive a paycheck or a loan payment from My Crop Shop.
 {¶ 68} Although there is no claim that Anderson's store employees are not paid for their work, apparently, as of October 1, 2003, Anderson herself had not received a "paycheck" from her business. Apparently, Anderson's investment in the business is treated as a loan to the business. Her loan will be repaid before Anderson receives a paycheck.
 {¶ 69} Nothing in Ms. Pennell's letter suggests that Anderson is not involved in the business venture for financial gain. As the business continues to be successful and the loan is eventually paid, Anderson will have an income or profit from her business.
 {¶ 70} Clearly, the SHO was incorrect in holding that Anderson's activities cannot constitute work because she "did not receive any income or wages."
 {¶ 71} The commission also erred by finding that Anderson's testimony that she only went to the store about three times per month is consistent with the number of occasions she was reported to be at the store by the surveillance evidence.
 {¶ 72} To conclude that the surveillance evidence is consistent with Anderson's testimony, one must ignore the high improbability of coincidence. Anderson was observed going to her store on each of the five days that surveillance was conducted. Indeed, it is highly improbable that Anderson's testimony is credible if the surveillance evidence is accepted.
 {¶ 73} Moreover, the SHO viewed the three occasions of "customer assistance" as minimal because he believed that Anderson was "investigated over a three-month period." Because the first surveillance occurred April 24, 2003, and the last surveillance occurred June 30, 2003, the period of the investigation was closer to two months. Framing the five surveillances into a so-called three-month period additionally distorts the picture because it fails to acknowledge that Anderson was observed rendering customer assistance on May 6 and May 8, 2003, i.e., on two different days during the same workweek.
 {¶ 74} The commission erred in its analysis to reach its conclusion that Anderson's customer assistance activity was minimal.
 {¶ 75} Given the above analysis, this magistrate concludes that the commission erred in failing to declare an overpayment of TTD compensation.
 {¶ 76} The second issue is whether the commission abused its discretion in finding that the compensation was not fraudulently obtained. In refusing to find fraud, the SHO relied upon Anderson's hearing testimony that shortly after opening her store she informed her rehabilitation case manager that she had done so. Anderson's testimony was corroborated by a letter, dated September 3, 2003, from Bettye Hayworth-Colbert, R.N., who was Anderson's rehabilitation case manager. This letter states:
Per your request I have reviewed my file information to determine the date on which you informed me of your business venture and a brief synopsis of this conversation.
File notes indicate that on March 11, 2003 you informed me that you had utilized insurance money received from the death of your spouse to open a store in Marysville. The store was a scrapbook and archiving business being run by your daughters.
Return to work objections and needs were discussed with you in preparation for your upcoming follow up visit and possible discharge from care with surgeon Dr. Michael Stanton Hicks and your physician of record, Dr. Nucklos.
During this conversation you asked me if time you spent in the store performing tasks such as book keeping could be incorporated and considered a component of a Work Hardening or Work Conditioning Program. I informed you that I felt a more traditional facility based Work Conditioning or Work Hardening program would be appropriate and more likely to be approved by the employer. The Work Recovery Program offered by the employer was reviewed with you.
 {¶ 77} In the magistrate's view, Anderson's testimony, as corroborated by the letter, is some evidence supporting the commission's determination that the TTD compensation was not fraudulently obtained.
 {¶ 78} As Honda properly notes here, the commission's overpayment policy is set forth in its Hearing Officer Manual at Memo S2 which sets forth the six prima facie elements of fraud:
* * * The prima facie elements of fraud which must be established are: (1) a representation, or where there is a duty to disclose, concealment of fact; (2) which is material to the transaction at hand; (3) made falsely, with the knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. * * *
 {¶ 79} "Intent" is one of the key factors in determining fraud. The SHO found that Anderson did not have an intent to commit fraud because she did not believe that she was working when she indicated on the C-84 forms that she was not working. The SHO did not find it inconsistent for a person who has worked an hourly job all her life to believe that owning a business run by others would not be considered working.
 {¶ 80} As this case itself shows, the question of whether a claimant is legally viewed as working can become complex where the issue involves activities related to a business venture. The complexity of the issue can conceivably make it less probable that the claimant clearly understood how his or her activities would be viewed under the law.
 {¶ 81} It is the commission that weighs the evidence, and this is particularly so on the question of intent to commit fraud. Here, regardless of the fact that evidence tending to show fraud exists, the issue for this court is whether the SHO relied upon some evidence that supports his determination that the compensation was not fraudulently obtained. The magistrate finds that the commission's determination is supported by the evidence upon which it relied.
 {¶ 82} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate the January 13, 2004 order of its staff hearing officer, and in a manner consistent with this magistrate's decision, enter a new order that declares an overpayment of TTD compensation.